THOMSON-HOUSTON ELECTRIC CO. v. LORAIN STEEL CO.

(Circuit Court, S. D. New York.   July 11, 1900.)

1. PATENTS—INVENTION—ESTOPPEL OF IMPROVER.
   Where the device of a patent is workable, and embodies a novel and important principle in the art, a subsequent inventor who has adopted the principle and has improved the device in its details after it has been tested by practical use cannot deny patentability to the original invention on the ground that it was inoperative and crude.

2. SAME—INFRINGEMENT—ELECTRIC MOTOR REGULATORS.
   The Knight patent, No. 428,169, for an improved electric motor regulator, the principal feature of which is a locking device which prevents the movement of either the regulating lever or the reversing lever, except when the other is in a predetermined position, was not anticipated and is valid. Claims 1, 2, 3, and 4 also *held* infringed by an electric controller made in accordance with the Harris patent, No. 587,733, which is within the letter of the claims, and the same as the device of the Knight patent in its main operative features, although some of the minor details are neither the same nor equivalents.

In Equity.   Suit for infringement of a patent.   On final hearing.

Frederick H. Betts and L. F. H. Betts, for complainant.

Frank S. Busser, for defendant.

SHIPMAN, Circuit Judge.   This bill in equity alleges infringement by the defendant of claims 1, 2, 3, and 4 of letters patent No. 428,169, dated May 20, 1890, issued to Walter H. Knight for an improved electric motor regulator.   The patent has been owned by the complainant since November 7, 1891.   The invention was adapted to electric railway motors working on a circuit of "constant potential," and was designed to prevent the sudden overloading of the motor.   The patentee says in his specification:

"In motors on a circuit of this character, it is essential that a resistance or other device for opposing the electro-motive force should be inserted in the circuit whenever the motor is at rest, or its counter-electro-motive force substantially diminished.   Since a reversal of the motor, of course, reverses its counter-electro-motive force, it is essential that it should only be reversed when the motor is at rest, and when there is substantially no current passing through it.   A sudden reversal of the motor when in operation so affects the counter-electro-motive force that, unless a resistance is inserted, the sudden flow of current which ensues is so great as to burn out the machine.   Moreover, when the reversing device is a switch controlling the direction of current in either the field magnet or armature, it is apt to be injured by operating it while the current is passing."

When the motor is suddenly reversed, and the counter-electro-motive force is also reversed in consequence, if the motor cannot instantly get up speed in the opposite direction, it is in danger of being burned out; and, if the car is reversed very suddenly, pedestrians or carriages in the rear are in danger of accident.   In the pre-existing motors, a single handle was used, which was moved each way from a central position upon the regulator.   A forward movement sent the car forward, a reverse movement to the central position stopped it, and it was reversed by a continuation beyond that point.   The danger was that in a sudden, not anticipated emergency, the motorman would lose his presence of mind, and send the

car whirling backward, or that he would move his handle too far and reverse when he merely wished to stop. Separate handles were also provided, but, unless a definite stop was interposed, both the difficulty of ascertaining the precise point when the movement of the handle was to be stayed, and the danger, continued.

The patentee described in his specification his invention, as follows:.

"My invention consists in providing a reversing mechanism for the motor, with a stop or lock, so that it can be operated only when there is a sufficient amount of resistance inserted to prevent injury, and it, furthermore, consists in providing a stop or lock for the resistance-controller or regulator of the machine, by which, when the reversing mechanism is at the neutral point, the resistance cannot be cut out. These devices absolutely prevent reversal of the motor at an improper time, and also the operation of the regulator, unless the reversing mechanism is set in one direction or the other."

The locking device or "stop" is described as follows by the complainant's expert:

"There is shown in Fig. 1 a reversing device, with the lever or handle, A, and a controlling or regulating device, with the handle or lever, C. The reverser is indicated as an old-fashioned brush-shifter, but the inventor contemplates also the use of a reversing switch for changing the direction of current flow in the field magnet or armature, and so states in the specification, it being an immaterial matter what form the reversing device may take. The controller is shown as an old rheostatic controller, such as was the standard at that date; it being remembered that the application was filed March 13, 1886, a very early date in the practical development of electric railway apparatus. To the lever, A, is jointed a connecting-rod, E, which is in turn pivoted to a triangular-shaped block, F, having two projecting-pins, G, standing, when the lever is in its central position, in a gap in a flange formed on a sector on the

lower side of the regulating lever, C. Thus, when the reversing device is in its central position, the motor having no tendency either forward or backward, it is impossible to move the controller or regulator by reason of the flange, D, striking the pin, G. This is the condition shown in Fig. 1 of the patent. When, however, the reverser, A, is thrown to one side or the other, the block, F, is turned into the position shown in Fig. 2, or into the position shown in Fig. 3, according to whether the reverser is moved to the left or to the right; but in either case one of the pins, G, is turned to the inside of the flange, D, and the other to the outside of the flange, so that the regulator can be turned, the flange passing between the two pins without interference. Conversely, when the regulating lever, C, has been turned as just mentioned, so as to interpose the flange, D, between the two pins, G, it is impossible to move the reversing-lever, A, since the pins, G, by their engagement with the flange, D, will not allow the block, F, to turn by a push or pull on the connecting-rod, E, and consequently the reversing lever is locked."

It will thus be seen that the reversing and regulating devices act independently, but each device is used to lock the other, and the reversal of the motor cannot take place until the motorman unlocks it, and he cannot unlock it until he has brought the regulator to its "off" position; neither can he turn the current on and operate the regulator until the reverser is in its proper position. This stop locks one device or the other, and thus "compels the alternate operation of reverser and regulator by the operator," but when either is in operation it is unaffected by the other. The invention is the combination of the other elements with a novel and positive stop, which compels the motorman to an observance of its check upon the movements of the handle of both regulator and reverser, and is described in the four claims which are in controversy as follows:

"(1) The combination, with an electric motor, of a reversing device and regulator therefor, means for operating the same, and a stop for the reversing device, controlled by the regulator, whereby the reversing device can be operated only when the regulator is in a predetermined position. (2) The combination, with an electric motor, of a reversing device therefor, a regulator, a stop for the reversing device, controlled by the regulator for locking the reversing device, so as to prevent its being operated, except when the regulator is substantially at the point of maximum control. (3) The combination, with an electric motor, of a regulator therefor, a stop or lock for the regulator, and a reversing device for the motor connected to said stop, whereby the said stop is operated by the reversing device to lock the regulator against movement, except when the reversing device is in a predetermined position. (4) The combination, with an electric motor, on a constant-potential circuit, of a regulator and reversing device therefor, operated independently of one another, and an intermediate stop or lock connection, whereby the regulator and reversing device each controls the movement of the other."

The defendant, in attempting the defense of lack of novelty in the invention of the patent in suit, presents letters patent for electric motors to Edward Weston, No. 264,982, dated September 26, 1882; to Ernest W. Siemens, No. 322,859, dated July 21, 1885; and to Joseph Weis, No. 335,863, dated February 9, 1886. Each of the devices described in these patents has a single handle, which regulates and reverses in succession; and neither has a stop or lock, or any mechanism which can properly be called interlocking. Each has a bar which connects the regulator to the reverser, and which the defendant's expert designates as interlocking; but in either device a movement of the reversing lever also moves the regulating lever, and the regulator cannot be moved from one of its extreme

positions to the other extreme position without operating the reverser, and by one continuous movement of the handle the operator can go from full speed ahead to full speed in the opposite direction. Letters patent No. 273,490, of 1883, to Edison; No. 321,149, of 1885, to Sprague; No. 338,023, of 1886, to Bentley; No. 384,447, of 1888, to Julien,—were also referred to by Dr. Kennelly, one of the defendant's experts, as having a bearing upon the question of novelty. In these motors the regulating and reversing devices were separate and distinct, but neither had a stop whereby either device was stopped from movement. The Reckenzaun British patent, No. 5,375, of 1883, like the Weis, Weston, and Siemens patents, had no intermediate stops.

The next and remaining class of references alleged to be anticipatory contained the steam railway signal devices in patents to Buchanan, Finch & Moore, Toucey, Smith & Buchanan, and to Cummings. These patents relate to the interlocking of two levers in such manner that neither could be moved, except at a predetermined position of the other, and do not seem to be of importance in this connection. These various patents of all classes were also introduced to show that the improvement of Knight was an obvious one and devoid of invention; but the patents in regard to electric railroad motors not only show nothing of the kind, but show that the improvement in question was neither anticipated nor suggested in the prior art, was important, was a new departure from the previous methods of constructing railway electric motors, and other testimony shows that, in one form or another, it has been universally adopted.

The alleged inoperative character of the invention in suit is also dwelt upon by the defendant. It is true that the drawings in the specification were diagrammatic, were not working drawings, and that, after the principle of the invention was shown, subsequent mechanics could develop it in a better form or more perfect details than were used by the inventor before the test of actual and practical use had been applied to it; but in this case, as in many others, it is vain for a subsequent inventor, after having taken the new principle of a prior invention, and having worked improved details into his mode of operation, to decry the original invention as inoperative and crude. The original invention was workable, and, while it has been improved, it has been used abundantly.

The question of infringement is of the most importance. The defendant's motors are made upon the general plan shown in letters patent to Samuel Harris, No. 587,733, dated August 10, 1897, for an electric controller; one object of the invention being, as the patentee said in his specification, to produce automatically the "step by step" result of preventing "the reversing and cut-out switch from being moved except when the operating switch is at the 'off' position," and of preventing "the operating switch from being moved when the reversing and cut-out switch is at the 'off' position." The object of this part of his invention and its result were the same as the object and the result of Knight, and the defendant's mechanism contained the combination and each element of the first

four claims of the Knight patent, arranged as therein described. Harris wanted to use and did use Knight's method of locking, but he wanted to use it so as to lock the reversing switch in six different positions, whereas the Knight structure was made to lock the brush-reversing lever in two positions only. Furthermore, the defendant wanted to use locking mechanism in a double controller equipment, one at each end of the car, so that at the end of the route the mechanism at one end could be locked at an inoperative position, the handles could be taken off, and the motorman could go to the other end of the car, and use the controller at that end during the return trip. This was an additional reason and object for the employment of locking mechanism. As a matter of course, the details by which the stop was to be manipulated had to be changed, and the question is whether they were so changed as to bring them outside the sphere of equivalents. The fact that each device is within the letter of the claims, and each produced and was intended to produce the same result by a method of locking, is not decisive upon the question of infringement, because the alleged infringer must have reached the result by substantially the same means, and Knight cannot successfully monopolize the function of locking. Westinghouse v. Brake Co., 170 U. S. 537, 18 Sup. Ct. 707, 42 L. Ed. 1136. We must look further, and see whether substantially the same means were adopted; and upon this point the question of equivalency becomes somewhat complicated by the fact that Harris improved the Knight locking system so as to adapt it to a larger number of positions, and to a controller at each end of the car. The necessities of locking had increased since the date of the Knight patent in 1890, and therefore a larger locking arrangement was provided, which compelled a modification of the mechanical details of cams, levers, pins, springs, and the like, but the same general system is preserved in each device. The case, in its modification of the means of the pioneer patent for the purpose of an improved result, is like Machine Co. v. Lancaster, 129 U. S. 263, 9 Sup. Ct. 299, 32 L. Ed. 715, in which Justice Blatchford was not deterred by apparent and showy changes of means from the conclusion that both the principle and substantially the means of the pioneer patent had been used. In this case it cannot be found that each detail of the locking mechanism of Harris is an equivalent of each detail of the locking mechanism of Knight; and if that is a necessity the patent in suit would be worthless, because, after the practical electrician had been told to lock, a large variety of locking mechanism was open to him from which to make a choice of minor details. It is, however, true that "the main operative features of both machines are the same." Machine Co. v. Lancaster, supra. Let there be a decree, with costs, for an injunction against the infringement of claims 1, 2, 3, and 4 of the patent, and for an accounting.