## DUNBAR et al. v. EASTERN ELEVATING CO. et al.

### (Circuit Court, N. D. New York. July 20, 1896.)

1. PATENTS—INVENTION—ANTICIPATION—GRAIN ELEVATORS.

The Dunbar reissue, No. 10,521 (original No. 264,938), for an improvement in grain elevators, and consisting in a combination whereby the elevator tower may be quickly and easily moved, so as to reach the different hatches of a vessel, and two elevator legs may be simultaneously used, so as to take grain from two hatches at once, discloses a novel and very useful invention. The invention was not anticipated by the Firth patent, No. 258,043, which, though earlier in date, was subsequent in time of invention, or by the Sykes patent, No. 95,747, or any other devices; and the

reissue is valid, and entitled to a liberal construction, so as to cover the real invention.

**2. SAME—REISSUES—MISTAKE OF ATTORNEY.**

The fact that a patent solicitor consents to the striking out of certain claims upon the citation of a prior patent, which he supposes was prior in date of invention, but which is afterwards shown to be of a later date, does not invalidate a reissue, seasonably applied for, and by which the parts stricken out are restored, no adverse equities having intervened.

**3. SAME—INFRINGEMENT.**

One using the substance and essentials of a patented combination cannot escape infringement by varying nonessential details.

This was a suit in equity by George H. Dunbar and others against the Eastern Elevating Company and others for alleged infringement of a patent for improvements in portable grain elevators.

This action is founded upon reissued letters patent, No. 10,521, granted September 16, 1884, to Robert Dunbar, for improvements in portable elevators. The application for the reissue was filed October 20, 1883. The original, No. 264,938, was dated September 26, 1882. The original application was filed July 17, 1882. The patent is now owned by complainants. Prior to the invention elevators had been built with stationary towers so that only one hatch of a vessel could be unloaded at a time. When this hatch was emptied, the vessel was moved until another hatch was brought opposite to the elevator tower. The object of the inventor was to produce a portable tower capable of being easily and quickly moved so as to reach the different hatches of the vessel while lying moored at the dock. In this way two elevator legs may be operated simultaneously in the same vessel, a stationary leg taking the grain from one hatch and the portable leg from another. Time is saved and less dockage room is required. During the operation the vessel remains on an even keel, thus avoiding the strain of being unequally unloaded. A sailing vessel discharging from two hatches elevates her cargo in less than half the time occupied by a vessel using but one. Not only is twice as much grain taken out, but the tedious process of having the vessel moved by the hands on the dock is avoided. These results are accomplished by disconnecting the tower from the main elevator building, except by movable supports, mounting it upon wheels and providing mechanism by which it can be moved to any desired position upon the track, and also providing a spout for transferring the grain from the tower to the main elevator by means of a long trough placed horizontally along the elevator front.

The complainants maintain that all of the claims are valid and infringed. They are as follows: "(1) In an elevator tower, the combination of the mechanism, substantially as described, for moving it horizontally back and forth, with the gearing N, drums N', and cables O, for securing it at any point to which it may be moved. (2) A movable and adjustable elevator tower arranged upon wheels, and provided with the cables O, gearing and drums or pulleys N N', and a grain-spout, R, in combination with a main stationary elevator building, R', having a long horizontally arranged trough, S, to receive the grain from any point to which the elevator tower may be adjusted. (3) The combination of the main stationary elevator, and the movable elevator tower A, having wheels adapted to tracks in front of the main building, substantially as specified, whereby two elevators may be operated at the same time, so that a stationary elevator may be used in one hatch, while the movable elevator may be adjusted to operate in another hatch substantially as specified. (4) The combination of a movable elevator tower, having wheels adapted to tracks, with a rope or chain, G G', anchored at both ends, and passing around a drum or pulley, and with gearing through the medium of which the said drum may be rotated, substantially as set forth. (5) The combination of the stationary elevator R', a movable elevator tower, ropes or cables connecting the two, and mechanism as shown, whereby said ropes may be tightened and loosened, all substantially as described." The first claim of the reissue is the same as the second of the original. The second claim of the reissue is the same as the third of the original. The other claims of the reissue bear a marked similarity to claims which

were in the original but were withdrawn. The defenses are lack of novelty and invention, noninfringement and invalidity of the reissue as such.

Franklin D. Locke, for complainants.

George L. Lewis, for defendants.

COXE, District Judge. The idea of moving the elevator leg to the hatch of the vessel instead of moving the hatch of the vessel to the elevator leg was, certainly, a brilliant and ingenious one. It was entirely new with Dunbar. No one had thought of it or anything like it in connection with grain elevators. The saving in time is obvious. That large sums of money must be made by the quick dispatch thus given to vessels is beyond dispute. Acquiescence in the patent has been well-nigh universal. The patent to Frank J. Firth, No. 258,043, dated May 16, 1882, embodies the same idea as the patent in suit, but I understand it to be admitted that Dunbar's invention was prior to Firth's. The record is very unsatisfactory on this point and much of the testimony is hearsay and incompetent. The substance of it is that the issue between Dunbar and Firth was tried out in the patent office and priority was awarded to Dunbar. Assuming that I am right in the supposition that the defendants do not deny this priority, there is nothing else in the prior art which anticipates or seriously limits the patent in suit. The best reference is the patent to Sykes, No. 95,747, for a railroad grain transferrer which carries grain from one car to another. As shown in the drawings, the trunks or tubes are made to swing upon a hinge at the bottom. The grain may be taken from either side of the car which carries the hoisting apparatus, but it is delivered from the end only to a car upon the same track. The device could not be used to deliver grain from a vessel to an elevator, and it would not suggest to the skilled mechanic such a structure as Dunbar conceived. Certainly no one ever did think of it, though the Sykes patent was granted in 1869. Whether the Sykes hoisting device ever went into practical operation does not appear. Dunbar knew, of course, that elevators and elevating legs and similar mechanisms were old. What he wished to accomplish was the transfer of grain from the hold of a vessel to the immense storage houses without continually shifting the vessel. Did Sykes show him how to do this? Manifestly not! Assuming that Sykes's patent showed him that a machine for shifting grain from one freight car to another might run on a railroad track it did not show him how to shift the tall elevator tower, often weighing as high as 600 tons, which had always been stationary and an integral part of the house. But even if the idea were suggested it required something more than mechanical skill to adapt the Sykes structure to the vastly different environment.

Since the decision of Potts & Co. v. Creager, 155 U. S. 597, 15 Sup. Ct. 194, the courts are prone to look with more favor upon the work of the inventor who produces a new result even if he does it with an old device, provided important changes are required to adapt the old device to its new use. "Indeed," says the supreme court, "it often requires as acute a perception of the relation between cause and effect, and as much of the peculiar intuitive genius which is a characteristic

of great inventors to grasp the idea that a device used in one art may be made available in another as would be necessary to create the device de novo."

Can any one doubt that Dunbar's task would have been quite as difficult if the Sykes patent had never seen the light? The patent to Walsh shows a portable elevator designed to be placed upon the deck of a boat or the roof of a car. The patents to Winslow and Goldsmith show a similar construction designed, mainly, for discharging coal. The patent to Godwin shows an appliance for facilitating the transmission of grain or other bulky cargo from ship, quay or other place to a warehouse "when sacks and other containers and carts or vehicles are employed." The other references are still more remote. What has been said of the Sykes patent applies with greater force to each of the others. The patent cannot be held void for lack of novelty.

The drawings of the original and reissued patent are the same except in one unimportant particular. The descriptions are identical. The claims of the original are, substantially, reproduced in the reissue. The file wrapper of the original is very meager, and the proceedings in the Firth interference do not, apparently, appear in full in the record; but the solicitor who acted for Dunbar testifies that the sole reason for limiting the claims of the original was the discovery of the Firth patent. He says that he supposed at the time that the Firth invention was prior to Dunbar's, and so consented to strike out the fourth and fifth claims. Subsequently, on discovering that Dunbar was first in point of time, he applied for the reissue for the purpose of having restored what had thus been inadvertently given up. To the same effect is Dunbar's affidavit of October 6, 1883. If this be a correct statement of the facts, it is plain that the patentee should not suffer for the very natural mistake of his solicitor. What else could he do? He could not appeal because the Firth patent was before him on the record, and his own eviscerated patent had actually been issued. In order to get what he was entitled to it was necessary, first of all, to dispose of the Firth patent. When that was done a patent commensurate with the invention could be granted to Dunbar, but not before. To hold that the patent in suit is invalidated by the proceedings in the patent office is tantamount to a declaration that a meritorious invention may be destroyed by a patent subsequent in point of fact, but improperly bearing a prior date. I can see no equity in such a ruling. Unless Dunbar's conduct has deprived the public of some right, he should have the fruits of his invention. The defects which have proved fatal to other reissues are all wanting here. The application for the reissue was seasonably made. Between the original and the reissue no adverse equities sprang up. Indeed, as Dunbar was the first in this particular field, and as no one has attempted to dispute his right until the defendants built their elevator, no one can be misled by giving him a patent equal to his invention. To restrict him to less than this because of the reissue would be an arbitrary injustice without sense or precedent.

The defendants, for some time prior to the commencement of this

action, were, and now are, operating a movable tower in connection with the elevator owned by them at Buffalo. That this tower has the main characteristics of the patented structure is beyond dispute. It is mounted upon wheels moving upon rails. It is moved back and forth by machinery located in the tower. It discharges grain into the main house, and when located for operation, it is held in place by guys or stays.

There seems to be some misconception as to the scope of the third claim; the last clause having, apparently, caused the confusion. If this clause imported into the claim a stationary tower and sought to cover, merely, a combination of the two legs when operating in the same vessel, there would be considerable plausibility in the argument that nothing more than an aggregation is described. After the movable tower is anchored and in operation, it is precisely like the other towers, and there can be no more joint action between it and a stationary tower than between two stationary towers. If one pump will not empty a reservoir, a second may be brought into action, but each acts in the old way independent of the other. There is no co-operation between them in a patentable sense. So with two elevator legs. National Progress Bunching Mach. Co. v. John R. Williams Co., 44 Fed. 190, 192, and cases cited.

But I do not understand that such a construction of the third claim is necessary or even permissible. The clause beginning with the words, "whereby two elevators," etc., is merely descriptive of the result which is accomplished; it adds no new element to the combination; it might as well have been omitted. The claim is a broad one for the combination of the main house and the movable tower as shown and described. It is not for every elevator and every tower, but for the elevator and tower of the description and drawings. The tower contains 11 stories, approximating 100 feet in height. It is mounted on wheels moving on rails, and is provided with machinery for preventing it from tipping forward when in use. The storage house is one corresponding in dimensions with the tower. It is so constructed and arranged that grain can be received in its bins from any point along its front to which the tower can be moved. The combination of such a tower and such a house produces the advantageous results before referred to. It is not an aggregation but a valid combination, in which each element limits and qualifies every other and helps to produce the desired result. Such a combination was unknown before. It was new, useful and entitled to protection.

I do not deem it necessary to enter into a minute analysis of the other claims. Unquestionably the methods adopted by the inventor to carry out his conception, considered separately, were old, but the combinations were new. Wheels, tracks, spouts, windlasses, troughs and guy-ropes were undoubtedly well known, but no one had ever assembled them in congeries producing a movable elevator tower. The complainants are entitled to a construction broad enough to enable them to secure the fruits of Dunbar's actual invention. Nothing in the patent or the art limits them to a Chinese copy of the description and drawings. An infringer cannot escape

by varying nonessential details. For instance, in the patent the grain is received from the spout into a long trough; in the defendants' structure it is received into a series of hoppers arranged side by side,—in fact, the complainants' trough partitioned off. In the former the tower is held in place by cables tightened by drums; in the latter by hooks tightened by screws. In the one case the tower is moved by an anchored rope passing around a drum; in the other by a sprocket and chain supplemented by hand power. But all these things are not of the essence of the invention. Dunbar showed one method of accomplishing the desired result. The defendants show a slightly different method of accomplishing the identical result, and, because they have left the shadow, they assert that they may take the substance with impunity. The law is otherwise.

To paraphrase the language of the supreme court in Machine Co. v. Lancaster, 129 U. S. 263, 284, 9 Sup. Ct. 299:

"It makes no difference that in the infringing structure, the staying mechanism is more simple, and the propelling mechanism and the mechanism for receiving the grain are different in mechanical construction, so long as they perform each the same function as the corresponding mechanism in the Dunbar structure, in substantially the same way, and are combined to produce the same result."

It follows that the complainants are entitled to the usual decree for an injunction and an accounting, with costs.