## OILGEAR CO. v. J. N. LAPOINTE CO.

District Court, D. Connecticut. June 28, 1929.

No. 1893.

George T. May, Jr., and Frank Parker Davis, both of Chicago, Ill., for plaintiff.

Charles Neave, of New York City, and Everett E. Kent, of Boston, Mass., for defendant.

THOMAS, District Judge. The bill in this case charges the defendant with infringement of letters patent, No. 1,468,595, granted to plaintiff on September 18, 1923, upon an application filed by Walter Ferris on October 26, 1922, for a broaching machine. Claims 3, 11, and 12 are in issue.

In its answer denying invention and infringement, the defendant also pleads a counterclaim alleging that the plaintiff is infringing its Lapointe patent, No. 1,109,847, issued September 8, 1914, on an application filed August 23, 1913. Claims 6 and 7 of this patent are in issue.

The chief defense to the plaintiff's case, in fact the only one, is defendant's denial of invention in the patented combination set forth in the Ferris patent on the ground that it is a mere double-use or aggregation of known devices.

As to the counterclaim, the defenses set forth by the plaintiff are the usual ones of noninfringement and invalidity by reason of anticipation by and lack of invention over prior patents.

The three claims of the Ferris patent relied upon by the plaintiff read as follows:

"3. In a broaching machine the combination of a member for actuating a broaching tool, hydraulic means for driving said member, and a reversible, variable displacement pump for delivering liquid to said means to maintain a substantially steady advance of the broaching tool at a predetermined rate irrespective of variations in tool resistance or pressure."

"11. In a pull broaching machine, the combination of a tool pulling member, hydraulic means for driving said member, a variable displacement pump for delivering a driving liquid to said hydraulic means at a rate corresponding to pump displacement, and means for varying the displacement of said pump to regulate the rate of travel of said member."

"12. In a pull broaching machine the combination of a tool pulling member, a piston and cylinder for driving said member, a variable displacement pump for delivering a driving liquid to said cylinder at a rate corresponding to pump displacement, and means for varying pump displacement to regulate the rate of travel of said member."

The invention of the Ferris patent relates to a broaching machine and more particularly to that type which is known in the art as a pull broaching machine—so called because the tool which is designated a broach is pulled through or over the work. A broach

is a cutting tool in the form of a straight steel rod or bar provided with teeth of progressively increasing sizes, to be pushed or pulled through a hole for increasing, shaping, or refinishing the hole, or, in some cases, to be pushed or pulled over a surface of metal, for reducing, shaping, or finishing the surface.

As appears from the patent in suit and also from the record, broaches and broaching machines were old long prior to the filing date of the patent in suit. In all of these machines the tool is moved in a straight line, back and forth, in relation to the work to be operated upon. Prior to the date of the patent, the most common method of driving the tool in standard broaching practice was by the use of strictly mechanical mechanisms such as the well-known screw-and-nut drive or the rack-and-pinion drive. In another class of broaching, hydraulic presses were used to push the tool through the work. Several machines of the last mentioned type are illustrated in Viall's book entitled "Broaches and Broaching" published in 1918 —Defendant's Exhibit Z.

The patent in suit describes, and the claims in issue call for, a hydraulic broaching machine, the details of which need not be here recited. It is sufficient to say that the machine comprises a tool actuating crosshead 16, mounted for reciprocation between a pair of guides 17. This crosshead is driven primarily by a piston rod 18 connected thereto and to a piston 19 within a cylinder 12. The opposite ends of the cylinder are in direct communication through pipes 24 and 25, respectively, with the two sides of a hydraulic circuit established by a constant speed variable displacement reversible pump 26. The pump described in the Ferris patent is of the multicylinder type, and its characteristic feature is that, although driven at constant speed, by simple adjustment the pistons can be set so as not to move at all in their respective cylinders, in which case they do not displace or deliver any fluid to the cylinder 12—and yet by other adjustments the pistons can be set so as to deliver fluid at any predetermined rate in one direction or the other direction, whereby the rate of travel of the piston 19 may be regulated at will. In other words, the pump delivers a driving liquid to the cylinder 12 at a rate corresponding to pump displacement. Due to these adjustments, the broaching tool may be stopped when required in the operation of the machine, and the tool may be driven at different speeds during its working and return strokes.

Defendant contends that the patent in suit is invalid because prior to its grant variable displacement reversible pumps were well known and were used for directly operating machines of various kinds, and were proposed for driving broaches, although not actually used for such purpose, and that consequently it does not amount to invention to combine a pump of this type with a cylinder, where it acts to give to a piston a reciprocating motion in a straight line, the piston and cylinder construction being also well known, and to actuate thereby a pull broach. And so the defendant argues that in the aggregation of these well-known elements, each does what it had formerly done in the instrument or machine from which it was borrowed, and hence that each element operates in the old way and produces no new result.

But I conclude that this contention is not supported by the record. The hydraulic broaching machines to which the record refers are used to push the broaches through the work, running from 3 to 4½ feet per minute. See pages 16 and 23 of Viall, supra. They cannot be used for doing pull broaching work and were never intended for such use because tools of pull broaching machines are long, slender tools which would be rendered useless during and after the first operation if mounted upon or connected to the hydraulic mechanisms described in Viall. All strictly mechanical pull broaching machines, the screw-and-nut type and the rack-and-pinion type machines, broach slowly. They run from 3 feet per minute to 5 feet for the screw type machine, and from 4 feet 6 inches to 7 feet 4 inches for the rack-and-pinion type. For very light work these speeds may be exceeded, particularly in the rack-and-pinion machines. However, this type of machine (now practically obsolete) had a fatal defect, and the work turned out by them was imperfect because the broach operated by them had a tendency to "jump," which resulted in a "wavy" product. For this reason the screw-and-nut drive was almost universally adopted, because it insured a positive and uniform advance of the tool, irrespective of the wide variations of pull required by the range of large and small broaching tools, which are used on machines of a given pulling capacity. It was evidently due to this advantage that the screw type machines were almost universally adopted prior to the grant of the patent in suit—and this in spite of their slow rate of working speed, and although a good many broaching tools were broken while cutting because of a rotary twist imparted to the tool by the

screw type machine. It also appears from the record that, while the screw-and-nut type broaching machine has the advantage of a uniform cutting speed, it does not lend itself readily to changes of speed appropriate to the different classes of material operated upon, or to the different grades of tool steel used in the broaching tools.

Ferris was well aware of the defects and disadvantages of the broaching machines in common use prior to his invention, and surmounted all of them and improved the construction and operation of the well-known broaching machine by the use of a variable displacement reversible pump, combining the same with an hydraulic means for driving the tool carrier. True, pumps of this type were old and well known prior to the patent in suit, and they delivered fluid under pressure to a mechanism which is driven by the fluid as shown in the Janney patent, No. 924,- 787 of 1909, issued June 15, 1909, as well as in others. But the record is barren of any evidence tending, even in a remote way, to prove that the use of these pumps, and the mechanisms driven thereby, have been recognized by others prior to the invention of the patent in suit so as to obtain the advantages claimed to have been obtained and actually obtained by Ferris through the employment of the pump and the combination thereof with other elements recited in the claims here in issue. The fact that the use of these pumps was suggested prior to the patent in suit for making the combination set forth in claims 3, 11, and 12 here in issue has no bearing on the question under consideration, because whatever was published does not give sufficient information to defeat these claims, and the unpublished suggestions have no bearing on this case.

Prior to the time that plaintiff brought forward the patented machine the defendant was one of the leading manufacturers of pull broaching machines, which were known to the trade throughout the United States. Within one year the defendant was offering its hydraulic machines for sale. The answer admits that the defendant went over to the hydraulic machine to meet competition resulting from plaintiff's entry into the broaching machine business. The hydraulic machines have been favorably accepted by the trade, due, it seems, to their advantages over the strictly mechanical mechanisms—one of which advantages is their much greater operating speed.

■■ There is no doubt in my mind that the invention shows substantial advance in the art, and it is this kind of inventive thought Congress intended to protect as a valuable contribution to an useful art. It does not lie in the mouth of the defendant, after copying plaintiff's machine as well as reaping the benefits growing out of its manufacture and sale, to say that Ferris has done nothing but what was obvious and what had occurred to others, and aver that the use of a constant speed variable displacement reversible pump, as a means for actuating broaching tools, was plain and obvious to any one skilled in the art, and to rely upon these assertions in the face of the fact that the engineers of the Waterbury Company, whose pump defendant now uses, conceived the very same idea prior to Ferris.

It seems clear to me that this case is governed by the principle laid down in George Frost Co. et al. v. Cohn et al. (C. C.) 112 F. 1009. At page 1011 of 112 F. Judge Coxe said: "Like a jewel lost in a crowded thoroughfare—multitudes pass it unnoticed, some actually tread upon it, others stop and gaze for a moment, but hurry on deeming it some worthless tinsel; at last comes one who recognizes its value and picks it up. Others might have done this it is true, but they did not; he did, and is entitled to the prize which he has rescued from the mire. If one should attempt to snatch the gem from the finder on the ground that he passed it frequently and could have picked it up as well as not, he would in all probability be promptly turned over to the police as a thief or a lunatic. It is this capacity for accomplishing results, this faculty of seeing what others fail to see and hearing what others fail to hear which has always distinguished success from failure and the inventor from the mechanic. 'In the law of patents it is the last step that wins,' says the supreme court."

Of course, nothing is easier than to form an ex post facto judgment, but in Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U. S. 428, at page 435, 31 S. Ct. 444, 447 (55 L. Ed. 527), the Supreme Court of the United States, speaking by Mr. Justice McKenna, as to knowledge acquired after the event, said: "Knowledge after the event is always easy, and problems once solved present no difficulties, indeed, may be represented as never having had any, and expert witnesses may be brought forward to show that the new thing which seemed to have eluded the search of the world was always ready at hand and easy to be seen by a merely skillful attention. But the law has other tests of the invention than sub-

tle conjectures of what might have been seen and yet was not. It regards a change as evidence of novelty, the acceptance and utility of change as a further evidence, even as demonstration."

In view of the foregoing discussion I conclude that claims 3, 11, and 12 of the Ferris patent are valid and infringed by defendant's machine.

Turning now to the defendant's counterclaim on the Lapointe patent, the claims in issue read as follows:

"6. In a machine of the class described, the combination of two reciprocating tool holders; a working tool for each holder; means coacting with said tool holders for simultaneously reciprocating them in opposite directions; and means for predetermining the length of stroke of said holders and arresting the movement thereof at the end of said predetermined stroke."

"7. In a machine of the class described, the combination of two reciprocating tool holders; a working tool for each holder; means coacting with said tool holders for simultaneously reciprocating them in opposite directions; means for arresting the movement of said holders at the end of a predetermined stroke; and means for throwing one of said holders out of commission temporarily, moving the other holder a predetermined distance, and then again placing said first mentioned holder in commission."

The Lapointe patent is called a "keyseat broaching machine," and describes a screw-and-nut type broaching machine, which includes two toolholders, in each of which is mounted a broaching tool. Means are provided so as to reciprocate the toolholders simultaneously in opposite directions, as a result of which one of the broaches is always returning to its normal position preparatory to operating upon one piece of work, while the other tool is in operation upon another piece of work so that the machine will approximate the output of two single screw-and-nut type machines. A mechanism co-operates with the elements for predetermining the length of stroke of the toolholders, and the machine also possesses means for arresting the movement of the toolholders at the end of the stroke thus predetermined. Therefore, the operator is enabled to start one broach on its working stroke while giving his attention to the other broach. He can disengage one broach from its holder as soon as its working stroke is ended, and then start that broach holder on its return stroke while the other broach instantly begins its working

stroke without the operator's special attention. During the working stroke the operator continues to give his attention to the other broach, removes the finished work—sets a fresh piece of work in place—inserts the leading end of the broach through its fresh work, and attaches the broach to its holder as the return stroke of this holder nears its end, thus making the broach ready to start on its working stroke without further attention. Meanwhile the other broach has been on its working stroke and is arrested at the predetermined end of that stroke, which is synchronous with the ending of the return stroke of the first broach. If the operator is ready, he lifts out the broach which has completed its work and immediately starts its holder on its return stroke—the doing of which starts the working of the first broach. The two broachholders remain in step with each other, undergoing only such stops as are necessary for safety and for removal of a broach at the end of each working stroke. In practical effect the machine, as a whole, occupies the floor space of only one machine and requires the labor cost of only one operator and is driven by one source of power. It attains an output nearly equal to that of two machines as formerly built, which required the time of two operators and correspondingly more floor space.

In addition to the elements mentioned the machine has a mechanism whereby, when desiring to work with a stroke shorter than the maximum stroke, the loci of the strokes of both toolholders can be made to be at the work end of the machine—side by side, instead of one being at the work end and the other at the drive end. This mechanism comprises a means for throwing one of the workholders temporarily out of commission, moving the other holder a predetermined distance and then again placing the first-mentioned holder in commission.

■ Plaintiff maintains that claims 6 and 7 of the Lapointe patent are invalid in view of United States patent No. 489,523 to Carpenter, which admittedly shows no means for predetermining the length of the stroke in the sense of varying the stroke, and asserts that there was no novelty in so transmitting motion to oppositely reciprocating toolholders as to provide for varying their stroke in view of British patent No. 3 of 1866 to Thompson. It seems to me that this point is not well taken because, aside from the point that this Thompson British patent is in an art entirely remote from the broaching art, the machine described therein has two plung-

ers reciprocating oppositely, but not simultaneously. The plungers are worked by a crank which has a fixed stroke. There is no provision for changing the length of stroke or for predetermining it in any way. Consequently the combination of these two patents cannot result in the construction described in the Lapointe patent. The fact that an expert in the art may, by rearrangement of and changes in the elements of the alleged anticipating patents, obtain a function and operation similar to that disclosed and claimed in the Lapointe patent has no bearing on the issue here under consideration, because such rearrangement and changes are not suggested by the alleged anticipating patents, but rather by the construction described in the Lapointe patent. I conclude, therefore, that claims 6 and 7 of the Lapointe patent are valid.

■ Defendant alleges that plaintiff's "Twin-Ten" or double spindle machine, as shown in Defendant's Exhibits T and U, infringes claims 6 and 7 of the Lapointe patent. Plaintiff asserts, however, that the machine charged to infringe is totally unlike the patent in suit, structurally and functionally, because this machine is operated by an hydraulic system and not by a mechanical drive—or, in other words, not by a screw-and-nut drive as the machine described in the Lapointe patent operates, admitting, however, that both the machine charged to infringe and the patented machine may achieve corresponding results, in that during the working stroke of one broaching tool the companion tool is on its return stroke. It seems that the question to be here determined is as to whether or not the two machines do the same work in substantially the same way and accomplish substantially the same result, because in such case they are the same, even though they differ in form or shape. More specifically, it must be decided whether the combination of elements set forth in the claims in issue is embodied in the alleged infringing machine and whether the hydraulic elements of plaintiff's machine may be considered as equivalents of the corresponding elements of the machine of the patent.

As I view it, the best way to approach a consideration of this question is to attempt to read the claims on the alleged infringing machine.

Claim 6 specifies: (1) "Reciprocating tool holders," which are the elements 15 and 15' of Defendant's Exhibit T. (2) "A working tool for each holder," which is the broach. (3) "Means coacting with said tool holders for simultaneously reciprocating them in op-

posite directions," which are plaintiff's pistons 34 and 35 with their piston rods 42 and 43 and the hydraulic driving means 16 with its connection through the reversing valve 11, which causes the flow to be alternately out through the pipe 20, driving piston 35 to the right and piston 34 to the left as shown in Exhibit T, and then oppositely out through pipe 21, driving the piston 34 to the right and simultaneously piston 35 to the left. In normal operation the pistons move simultaneously, because they are in series in the same flow of oil, and oppositely because the cylinders 33 and 32 are, in effect, connected end to end by the passage 22. (4) "Means for predetermining the length of stroke of said holders," which in the plaintiff's machine is the arm 13 adjustable in position on the rod 10 and capable of being set at the desired end of the stroke, so that, when the cam 40 on either toolholder 15 or 15' reaches the predetermined place, this cam engages and pushes aside the knob on the end of the arm 13, thus turning the rod 10, and, in so doing (as shown in transverse section, Exhibit 32), operating through linkage 39 to set the plunger of valve 11 in the neutral position, which is represented in that figure chart 32, wherein the flow of oil is stopped, as oil cannot flow into either pipe 20 or 21 and cannot move in the system of cylinders 32, 33, which those pipes feed or relieve. (4a) "And arresting the movement thereof on the end of the predetermined stroke," which is done in the plaintiff's machine by the column of oil which remains in the system and cannot escape in the direction in which it was moving because the valve 11, through which it was flowing out, has been closed.

The setting of the arm 13 on the rod 10 predetermines the length of stroke, because it closes the control valve 11 when either toolholder 15 or 15' reaches it, which makes one end of the stroke and the place of beginning of the next stroke, and again closes the valve 11 when the other toolholder 15' or 15 reaches it after the next stroke is begun. Thus it defines both the beginning and the ending of the stroke. When the end of the predetermined stroke has been reached, both pistons 34 and 35 are arrested in their motion in mid-cylinder by the obstruction offered by the incompressible body of oil ahead of them so that they cannot, by momentum, coast beyond that point. This feature is the function performed by the brake 80 in the Lapointe patent.

Claim 7 adds to the features of claim 6: (5) "Means for throwing one of said hold-

934

ers out of commission temporarily." In plaintiff's machine the oil flow from the pump *16* is by-passed through valve *24* and pipe *25* so that piston *35* is out of commission, as it is held by the oil pressure brought against the head end of its cylinder in the position illustrated in the plan section, Exhibit 30, while the full oil pressure is also being applied to its face through pipe *20*, which normally would propel it to the right from the position there shown. (5a) "Moving the holder a predetermined distance." In plaintiff's machine oil is supplied through valve *24*, and by-pass *25* moves the piston *34* until its crosshead toolholder *15* encounters the stop element *13* at the place where it had been set to determine the distance which the holder is to be moved, at which place the arm *13* closes the valve *11* and thus stops further movement of piston *34*. (5b) "And then again placing said first mentioned holder in commission." In the plaintiff's machine this is done by closing the by-pass valve *24*.

From the foregoing it appears that plaintiff's piston *35* is put out of commission—piston *34* is moved a predetermined distance, and piston *35* is put back into commission, with the result that, in the operation of the machine which follows, the stroke of each piston will be shorter and will be at that end of its cylinder which is nearer the work. Upon the starting of the next stroke after the placing of the piston *35* in commission, piston *35* will move to the right and piston *34* will, from its new position, move to the left, and, as piston *34* reaches the end of the cylinder, the toolholder *15'* will reach the stop member *13* and shift the valve *11* before the piston *35* reaches the remote end of its cylinder *33*.

I conclude that plaintiff's machine not only contains a combination of all of the elements recited in claims 6 and 7, but that each mechanism, individually considered, is a proper equivalent for the corresponding mechanism in the Lapointe patent. The case at bar—as to the counterclaim—comes under the rule enunciated by the Supreme Court of the United States in Morley Machine Co. v. Lancaster, 129 U. S. 263, 9 S. Ct. 299, 32 L. Ed. 715, and I am therefore bound to hold that plaintiff's machine infringes claims 6 and 7 of the Lapointe patent.

Both the plaintiff and defendant are therefore entitled, under their respective patents, to a decree for an injunction, reference, and accounting, and without costs to either party.

Submit decree accordingly.